1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

GLORIA J. PITTS,                                    Case No. 2:16-cv-02116-APG-GWF

                              Plaintiff,

        v.                                         **REPORT AND RECOMMENDATION**

NANCY A. BERRYHILL,
Commissioner of Social Security

                              Defendant.

This matter is before the Court on Plaintiff's Motion for Reversal and/or Remand (ECF No. 14), filed on January 1, 2017. Defendant filed her Cross Motion to Affirm and Opposition to Plaintiff's Motion for Remand (ECF Nos. 17 and 18) on March 22, 2017. Plaintiff filed her Reply (ECF No. 19) on April 11, 2017.

**BACKGROUND**

A. **Procedural History**

On August 6, 2013, Plaintiff filed an application for a period of disability, disability insurance benefits, as well as an application for supplemental security income. *See* Administrative Record ("AR") 190, 197. The Commissioner denied Plaintiff's application initially on January 22, 2014, and upon reconsideration on April 29, 2014. AR 51, 135, 140. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was conducted on August 4, 2015. AR 65-92, 146-147. Plaintiff and a vocational expert, Bernard M. Preston, testified at the hearing. The ALJ issued his decision on November 17, 2015 and concluded that

1

Plaintiff was not disabled as defined in the Social Security Act at any time between the alleged onset of disability, January 1, 2014, and the date of the decision. AR 51-59. The Appeals Council denied Plaintiff's request for review on July 6, 2016. AR 1-6. Plaintiff then filed this action for judicial review. This matter has been referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

**B. Factual Background**

### 1. Plaintiff's Disability/ Work History Reports and Hearing Testimony

Plaintiff was born March 11, 1952. She is 5'5" tall and weighed 210 pounds at the time of her April 28, 2012 disability report. She resided with her husband. AR 224-226. Plaintiff has a high school diploma. She attended college for three years, but did not obtain a degree. AR 68.

Plaintiff worked a payroll supervisor and manager during the fifteen years preceding her application for disability benefits. AR 245-254. She was an assistant payroll manager at Wynn Resorts from June 2008 until June 2011. She was responsible for the calculation of taxes on daily deposits, making 401K calculations, preparing union reports, and quarterly tax filings. She used technical skills and knowledge to perform her job. During an average work day, she walked one and one-half hours, stood for one hour, and sat for four to five hours. She was required to kneel, and to handle, grab or grasp large objects. She wrote, typed, or handled small objects up to four hours a day. She lifted a maximum of fifty pounds and frequently lifted ten pounds. Plaintiff supervised twelve employees and had authority to hire and fire employees. She spent approximately two hours plus supervising employees. AR 245-246. After her employment with Wynn was terminated, Plaintiff worked briefly for a gaming company as a senior payroll clerk or supervisor from February 2012 to April 2012. AR 69-70, 227.

In her April 2013 disability report, Plaintiff listed the following disabling conditions: diabetes, high blood pressure, shingles, neck, back and bilateral knee pain, cholesterol and headaches. AR 225. She stated that she became disabled on April 28, 2012 when she stopped

working.[1]  AR 222, 226.  Plaintiff testified at the August 4, 2015 hearing that she was terminated by Wynn after she missed or left work for a doctor's appointment.  AR 72-73.  Plaintiff tried to obtain other work through a temporary employment agency.  She briefly worked for a gaming company in early 2012, but did not work after that assignment ended.  She testified that she was truthful with the agency about her medical condition, and believes that this may have prevented her from receiving other work assignments.  AR 73-74.

Plaintiff was injured in a motor vehicle accident in April 2013.  AR. 77.  She completed a function report on September 24, 2013 in which she stated that her ability to work was limited by the joint pain that she experienced all over, but especially in her hands and legs.  Her work required her to type on computers four to six hours a day.  Her eyes became tired and she needed frequent bathroom breaks.  She also needed to stop work and eat when her diabetes would "kick in."  Headaches, dizziness, and nausea also limited her ability to work.  AR 237.  In describing her activities during a typical day, Plaintiff stated that she made the bed with her husband's help. She took a bath, brushed her teeth and dressed.  She then drank coffee and ate toast.  She watched news programs, took medications, and napped on-and-off during the day.  She would then eat dinner and go to bed.  She sometimes took a half-mile walk during the week.  She sometimes had difficulty sleeping if her diabetes or blood pressure flared up.  AR 238.

Plaintiff stated that due to arthritis, she sometimes needed help dressing and getting in and out of the bathtub.  She was able to care for her hair with occasional help from her beautician.  She could feed herself and use the toilet by herself.  AR 238.  She did not need reminders to take care of her personal needs or grooming.  However, she sometimes needed reminders to take medicine or to remember how many pills she was supposed to take.  She was able to make sandwiches and frozen meals, and to sometimes prepare complete meals.  Prior to her disability, she cooked complete meals 3 or 4 times a week.  She was able to perform limited dusting, vacuuming, and laundry.  She could dust for one hour once every two weeks; vacuum

---

[1] In a July 30, 2015 letter to the ALJ, Plaintiff amended her alleged disability onset date to January 1, 2014.  AR 221.

for thirty minutes every two weeks; and do laundry for two hours weekly.   She needed help

dusting in high places, vacuuming stairs, and in getting clothes to the laundry.  AR 239.  She did

not do any gardening.  Plaintiff was able to go outside approximately three times a week.  She

drove a car and could go out alone.  She shopped in stores for food every two weeks for one

hour, and purchased household supplies every one or two months.  She was able to pay bills,

count change, and handle a savings account, checkbook or money orders.  AR 240.

In her February 13, 2014 disability report, Plaintiff stated that she had undergone

arthroscopic knee surgery to repair a lateral meniscus tear.  She was still experiencing swelling

of the knee which made walking and sitting painful.  She used a cane to relieve the knee pain and

help her balance.  AR 259.  She could no longer go to the market by herself and needed to rest

during shopping.  She had problems climbing stairs, difficulty with balance, and she walked

slower.  Weather changes affected her neck and back.  She could not drive when her neck pain

was too severe for her to turn her head.  She could not bend over to pick up things or tie her

shoes.  She needed assistance getting into and out of the tub.  She was able to cook, but could not

stand long on the ceramic floor, and needed to take rest breaks while cooking.  AR 263.

In a June 16, 2014 disability report, Plaintiff stated that her arthritis seemed to be getting

worse, and she had a very painful neck, shoulders and legs.  Arthritis caused swelling in her

hands and legs and she was in pain throughout the day.  She had a nerve sensation up and down

her legs.  AR 275.  She reported significant limitations and need for assistance in bathing,

driving, and performing household activities.  Her husband now had to occasionally help her

dress.  She could no longer vacuum the floor or go shopping.  AR 279.

Plaintiff testified at the hearing that her medications caused numerous side effects, but

she only specifically mentioned that they put her to sleep.  She tried to go to the gym, but could

not work out "because of my muscle situation and the cramping."  She disagreed with a

statement in a June 2015 medical record that she was working out a lot lately.  She testified that

she never worked out.  However, she and her husband tried walking at the YMCA.  After her

hospitalization in June 2015, her doctor, Dr. Bartholomew, advised her not to do anything other

than walking.  Even before the hospitalization, he told her to stop all exercise, including riding a stationary bike.  The doctor told her that exercise caused the enzyme levels in her muscles to rise and put strain on them.  AR 74-75.

Under questioning by her attorney, Plaintiff stated that she currently weighed 209 pounds, but that she weighed in the 180s before she stopped working.  AR 76.  She was injured in a car accident in April 2013 when her automobile was rear-ended by another vehicle.  She did not know the extent of the injuries caused by the accident, but agreed with her attorney that her health had gone downhill since the accident.  AR 76-77.  She was going to the laboratory every week to have her CPK level tested.  Her attorney asked her about the diagnosis of rhabdomyolysis.  In response, Plaintiff acknowledged that she had overall muscle weakness, and brown colored urine.  A muscle biopsy had been recommended, but not performed as of the date of the hearing.  Plaintiff testified that she had headaches approximately four days a week.  She had nosebleeds one or twice a week which would last five or six minutes.  AR 78-79.

Plaintiff acknowledged that she had been diagnosed with palindromic rheumatism.  She indicated that her pain moved about her body and affected her in a lot of ways.  "If it's in my shoulder I can't reach.  If it's my knee, my knee swells and feels like a brick.  Or if it's in my hands, my hands swell across my knuckles.  It's hard to move my fingers.  And sometimes I even get knots on them that I have to constantly rub and rub and rub."  AR 79-80.  She was unable to squat.  She did not know how much weight she could lift, but stated that she had difficulty lifting a quart bottle of water.  She used a cane most of the time, and she wrapped her knee for support.  She had difficulty keeping her neck in one position as would be required in order to look at payroll books or a computer monitor.  Her back tightened and was painful.  She felt like she had weights on her knee and shoulders which caused them to drop down.  She had a knot in her forearm that was very painful.  Her hands swelled and caused her to drop things.  She had difficulty using a hair dryer.  AR 80-81.

Plaintiff testified that most household chores were completed by her husband.  She spent most days watching television or trying to read although she has difficulty holding a book.  She

stopped taking baths and, instead took showers which was a little easier.  Her husband stood nearby to assist her in getting in and out of the shower, and also helped her get dressed or undressed.  Pain also made it difficult for her to perform personal hygiene activities.  She was frequently unable to prepare meals for herself, and no longer drove an automobile.  She had frequent sleep problems because of pain.  AR 82-84.

### 2.  Vocational Expert Testimony

The vocational expert, Mr. Preston, classified Plaintiff's past work as a payroll manager as skilled, sedentary work pursuant to the Dictionary of Occupational Titles ("DOT").  Her employment as a payroll clerk was semi-skilled, sedentary work.  AR. 87.  Based on Plaintiff's testimony that she was required to stand or walk two to four hours a day, Mr. Preston stated that her past work, as performed, would be considered light work.  AR 90.  The ALJ asked the vocational expert to assume a hypothetical woman who was of advanced age or closely approaching retirement age, and who had at least a high school education and the same work history as the Plaintiff.  The person's impairments would limit her to light work, with frequent climbing of stairs or ramps, occasional climbing of ladders, no climbing of ropes and scaffolds, occasional kneeling, crouching and crawling, and occasional exposure to cold temperature and to hazards such as heights or machinery.  Mr. Preston testified that a person with these limitations would be able to perform Plaintiff's past work as a payroll manager or payroll clerk.  AR 88.

The ALJ asked whether the hypothetical person could perform Plaintiff's past work if she were likely to be absent four days a month and could only sit for two hours out of an eight-hour day, and stand and walk up to two hours out of an eight-hour day. Mr. Preston stated that with these additional limitations, Plaintiff's past work and any other competitive work would be eliminated.  AR 89.  Plaintiff's counsel asked whether the hypothetical person would be able to perform Plaintiff's past work if she was off task 15 percent of the time or more.  Mr. Preston testified that 15 percent of an eight-hour work day equals 1.2 hours, which would eliminate the ability to perform Plaintiff's past work and any other competitive work.  AR 90.

. . .

### 3. Medical Records

Plaintiff had a history of chronic neck and back pain, diabetes type 2, hyperlipidemia and obesity for which she was seen and treated at the University Medical Center of Nevada ("UMC") primary care clinic after she stopped working in June 2011.  AR 370-386.

Plaintiff was examined by Dr. David Mumford on January 23, 2013 at the request of the Bureau of Disability Adjudication.  AR 317-323.  Plaintiff stated that she had neck and back pain that occurred on and off on a daily basis. The pain did not radiate. She also reported pain in the shoulders, hands and right hip which had been diagnosed as rheumatoid arthritis.  The pain in these areas also occurred on and off on a daily basis, with swelling of the feet, hands and fingers, and stiffness of the neck and knees.  Plaintiff had sought medical attention for these problems, but was not currently receiving treatment.  AR 317.  Her current medications included Metformin (for diabetes), Amlodipine Besylate (for hypertension), Losartan (for hypertension), and Atorvastatin (for cholesterol).  AR 318.

Dr. Mumford noted that Plaintiff's movements were normal and she did not need an assistive device for ambulation.  She was able to sit comfortably in a chair without shifting, and was able to stand up from a sitting position, and sit up from a supine position without difficulty. She got on and off the examination table without the assistance of a foot stool.  Range of motion of the neck was within normal limits, and there was no pain on movement, and no paravertebral muscle spasm.  Examination of the shoulders, hands, hips and knees was normal.  There was no deformity or swelling of any joint.  Ranges of motion for the upper and lower extremities were also within normal limits.  AR 319-320.  Examination of the back did not reveal significant kyphosis, lordosis, or scoliosis.  Palpation of the paravertebral area did not cause pain.  Range of motion was normal.  Sitting and supine straight-leg raising was normal.  Plaintiff transferred easily from a sitting to a lying position, and she was able to sit up from a lying position with her legs fully extended and touch her ankles.  Neurological examination was normal.  Her gate was normal in high heel shoes.  She had normal tandem walk, toe walk and heal walk.  Sensory examination was also normal.  AR 320.  Dr. Mumford's diagnosis was chronic neck and back

pain.  There was no objective evidence of diabetic complications on physical examination, and no evidence of rheumatoid arthritis or any acute or chronic arthritic condition.  Dr. Mumford's diagnosis was "multiple arthralgias."  AR 321.

Dr. Mumford provided the following physical functional assessment:  Plaintiff was able to lift 50 pounds occasionally, and 10 pounds frequently.  She was able to stand and/or walk, or sit for 8 hours during an 8-hour workday.  She did not need a cane or assistive device for ambulation.  Standard breaks and a lunch period would be sufficient for any need to alternate between sitting and standing.  There were no restrictions on Plaintiff's ability to climb ramps or stairs, ladders or scaffolds, balance, stoop, kneel, crouch, squat, or crawl.  There were also no limitations on reaching, fingering, handling objects, hearing, seeing, speaking or traveling, and there were no environmental restrictions.  AR 321-323.

On April 2, 2013, Plaintiff was a passenger in a stopped vehicle that was struck from behind.  Her knees hit the dashboard.  She did not experience immediate pain, but had the onset of back and neck pain two days later.  She also developed bilateral leg pain approximately 8 days after the accident. On April 17, 2013, she had limited range of motion of the cervical and lumbar spines, and was noted to have an antalgic gate.  AR 338-339.  She also complained of headaches, weakness and a burning sensation.  AR 337.  Plaintiff reported a decrease in her activities of daily living due to the pain of stooping and lifting.  AR 334.  A left knee MRI performed on May 23, 2013 revealed a torn medial meniscus.  AR 328.  Cervical and lumber spine MRIs revealed degenerative conditions, discs protrusions, and canal stenosis, but no acute injuries.  AR 415-418.  On July 9, 2013, Plaintiff stated that she continued to experience neck, back and knee pain.  She rated her pain level as a 5.  Dr. Chambers instructed her to increase her physical activity as tolerated.  He noted that she agreed to start 10-15 minutes of exercise twice a day.  AR 325-326.  Plaintiff received physical therapy for her neck and upper back and was discharged from that therapy on July 16, 2013.  AR 483-484.

Plaintiff also complained of right knee pain.  An x-ray of her right knee on July 25, 2013 indicated that the right knee was radiographically intact.  AR 363.  Plaintiff underwent

arthroscopic surgery on the left knee on September 5, 2013. AR 409-410. She received physical therapy for the left knee from September 18, 2013 through February 25, 2014. AR 431-32, 437, 453-481. On October 30, 2013 she reported to her orthopedic surgeon's office that she was doing 75% better, but still had swelling when she was on her knee a lot and had pain when she walked. AR 437. Plaintiff was seen at the UMC primary care clinic on January 2, 2014 for complaints of left knee pain, which she rated as a 4 on a scale of 1 to 10. Her medications for inflammation, hypertension, and arthritis were refilled and she was instructed to increase her activity and adjust her diet. AR 442. The February 25, 2014 physical therapy discharge summary indicated that Plaintiff had not fully recovered function of the left knee. AR 459-461.

Plaintiff was examined by Dr. Jerrod Sherman on January 13, 2014 at the request of the Bureau of Disability Adjudication. She complained of intermittent, aching neck pain, with episodes of aching pain across the tops of both shoulders. She had episodes of painful limited neck motion, and stated that her neck pain was made worse by any pushing, pulling or lifting 20 pounds. AR 446. She also had constant aching mid and low back pain without radiation into the legs. The back pain was made worse by sitting or walking one hour, standing one-half hour, any lifting, and by pushing and pulling, but not by coughing. Plaintiff claimed painful, limited back motion, and stated that she occasionally wore a back brace. She had been using a cane on a daily basis since September 2013. She had constant aching left knee pain with painful limited motion. She also reported constant swelling, frequent clicking and giving away of the knee, but no locking. Her left knee pain was made worse by walking 10 minutes. She avoided squatting, and wore a left knee corset on a daily basis. AR 447.

Dr. Sherman noted that Plaintiff walked easily on her heels and toes. She performed a normal squatting maneuver. She did not need a cane in order to walk in the office. She gained the examining room table easily and sat up from a lying position without difficulty. Examination of her neck revealed normal range of motion with complaints of pain at the extremes. There was no muscle spasm or tenderness about the cervical spine. AR 447. Examination of the upper extremities also revealed normal ranges of motion of the shoulders, elbows, wrists, and small

joints of the hands and fingers.  There was no muscle wasting or fasciculations in the upper

extremities.  There was normal appearance, grip strength and sensation in both hands.  Plaintiff

easily made a fist.  AR 448.  Plaintiff had normal ranges of motion of the spine in the standing

and sitting positions.  Examination in the supine position showed equal leg lengths, and normal

range of motion of both hips, the right knee and both ankles.  There was no muscle wasting or

fasciculations in the lower extremities.  Her left knee flexed from 0 to 120 degrees with

complaints of pain during the entire range of motion.  She also complained of pain on light touch

about the anterior left knee.  AR 448.  X-rays of the cervical spine showed moderate

degenerative arthritis at C5-6 and C6-7 levels, but the disc spaces were maintained and there was

no fracturing or osteoporosis.  X rays of the lumbar spine were normal, without evidence of

osteoarthritis, osteoporosis, or fractures.  The disc spaces were also well maintained.  X-rays of

the left knee also revealed no osteoarthritis, osteoporosis, or fractures, and the knee joint was

maintained.  AR 448.

Dr. Sherman opined that Plaintiff was able to sit, stand, and walk for six hours during an

eight-hour day, and did not require a cane, brace or assistive device to ambulate.  She could

frequently lift 20 pounds and occasionally lift 30 pounds, with no restrictions regarding forward

bending at the waist, occasional squatting, kneeling, and crawling.  She had no restrictions

regarding use of the upper extremities for reaching, pushing, pulling, grasping, and fine

manipulation activities with the hands.  AR 449.  He noted on a residual functional capacity

checklist that Plaintiff had constant pain complaint[s] and that she appeared manipulative.  AR

451.

Plaintiff was seen at the UMC primary care clinic on April 1, 2014.  She complained of

neck pain and increased knee pain.  She rated her pain at a level of 4 to 5.  It was also noted that

she used a knee sleeve.  She was advised to return to the clinic in 6 months.  AR 546.  She was

seen on June 17, 2014 for nosebleeds and a continuous three-day headache which she rated at a

pain level of 6.  She was diagnosed with sinusitis and epistaxis (nosebleed).  Her discharge

instructions included Flonase and ibuprofen.  AR 565.  During an October 7, 2014 medical

check-up, Plaintiff reported no pain.  AR 576.  On February 9, 2015, however, she complained of left shoulder pain which she rated as a 7.  AR 573.  On March 6, 2015, she complained of body pain all over which she rated as a 5.  The diagnoses included back pain, wandering joint pain, and elevated liver enzyme.  She was placed on a low fat and carbohydrate diet, and was given a referral to a rheumatologist.  AR 570

On May 1, 2015, Plaintiff was seen by Dr. William Kim, a rheumatologist, pursuant to a referral by her UMC physician, Dr. Bartolome.  AR 579-580.  Plaintiff reported migrating joint pain, including the knees, ankle and neck.  She complained of shoulder pain and stated that her hands were stiff and her left hand "gets swollen a lot."  On physical examination, Dr. Kim noted that left shoulder motion caused pain and motion was decreased.  AR 579.  Plaintiff was able to make a full fist and extend her fingers.  Her hand grip was good.  Crepitation of the knee on motion was noticed.  Examination of the ankles and feet was unremarkable, except for mild tenderness of the feet on palpation.  AR 580.  Clinically, Plaintiff did not have a deformity to suggest long-lasting rheumatoid arthritis, or acute synovitis to suggest active rheumatoid arthritis. She had positive anti-nuclear antibody without definite evidence of internal organ involvement.  She had positive RNP without Raynaud's disease. The shirmer test was normal. Dr. Kim diagnosed left shoulder bursitis and mild capsulitis, and degenerative joint disease.  He stated that her symptom suggested palindromic rheumatism.  He also diagnosed diabetes mellitus and hypertension.  Dr. Kim recommend that Plaintiff do range of motion exercises to prevent frozen shoulder, and stated that he would see her in three months, unless her pain got worse.  AR 580.

Dr. Kim saw Plaintiff on June 4, 2015.  She reported that her hands were stiff, her shoulder still hurt, and she had right groin pain.  She had been told that her CPK (creatine phosphokinase) was elevated.  Her right hip gave out a few times a day and she had been advised to use a cane.  Her cholesterol medication had been discontinued.  On physical examination, Dr. Kim noted that left shoulder motion caused pain and that Plaintiff's left shoulder motion was decreased.  Her right hip motion was "OK without much pain on motion."  Crepitation of the

1    knee on motion was noticed.  Upper and lower extremity muscle strength was good and she

2    could stand from the sitting position without support.  Dr. Kim stated that Plaintiff needed a

3    repeat check of her CPK and aldolase levels.  AR 807.

4        Plaintiff was admitted to MountainView Hospital on June 13, 2015 because of elevated

5    creatinine kinase ("CK") levels.  According to the "History of Present Illness:

6
> The patient has been seen by her rheumatologist recently for her arthritis and
7
> bloodwork has been done including the CK level.  The patient was called from
> the laboratory center regarding her elevated CK level.  The patient was advised
8
> to come to the hospital per her primary care physician recommendations.  Her
> CK was above 1600.  Previously, the patient had elevations of the CK, but
9
> does not remember the level and total body aching more than 3 months ago.
> For that reason, the patient's physicians have taken her off atorvastatin and
10
> metformin about 3 months ago even though her body is achy still, not
> improved even worse.  The patient also mentions a right hip pain with
11
> ambulating intermittently more than 3 week ago.  The patient denied any
> strenuous exercise.  Denies generalized or focal weakness.  The patient does
12
> not have any chest pain, shortness of breath, diarrhea, dysuria, frequency or
> urgency.[2]
13

14       AR 599.

15       The physical examination findings on June 13, 2015 indicated that Plaintiff was in no

16   acute distress.  The musculoskeletal findings indicated no tenderness on palpation, strength 5/5

17   symmetrically upper and lower extremities, no pedal edema (swelling of lower legs).  Range of

18   motion of the joints was within normal limits.  There was mild tenderness on the left shoulder on

19   palpation.  The neurologic examination was normal.  AR 600.  The admitting doctor's

20   impression were: (1) elevated CK level, (2) questioning myositis (muscle inflammation) versus

21   statin adverse effect; (3) questioning rhabdomyolysis, (4) diabetes, (5) arthritis, and (6) history of

22   hyperlipidemia (high cholesterol).  AR 600.

23       According to the June 16, 2015 discharge summary, Plaintiff did "not report any new

24   body aching over the past few months."  During the hospitalization, she received IV fluid

25   hydration.  Her CK level came down significantly and she reported feeling better and was

26
27   _____
[2] Although the admission report stated that Plaintiff denied any strenuous exercise, she reportedly stated
that she had been "working out a lot lately."  AR 586.

28

1    discharged home.  The discharge diagnoses were (1) elevated creatine kinase levels, (2)

2    rhabdomyolysis, (3) possible adverse reaction to statin medication, (4) type 2 diabetes, (5)

3    arthritis, (6) hyperlipidemia, and (7) anxiety.  Plaintiff was advised to follow-up in one week

4    with her primary care physician for CK draw.  AR 584.

5     Dr. Kim saw Plaintiff on July 2, 2015.  He noted that her CPK level was 1582 on June

6    8th, and was 1391 on June 22nd.  AR 805.  Dr. Kim again recommended that Plaintiff do range

7    of motion exercises for her shoulder pain and to prevent further frozen shoulder.  She preferred

8    not to have a muscle biopsy.  He stated that Plaintiff would undergo an MRI of the right thigh

9    muscle.  AR 805.  On July 30, 2015, Dr. Kim noted that the MRI of the right thigh muscle was

10   normal.  AR 802.  Because the MRI was normal, there was a good chance the biopsy would also

11   be normal. AR 803.  On October 19, 2015, Dr. Kim noted that Plaintiff's CPK level was 356 on

12   September 3, 2015.  AR 811.  He noted that there was a report of an abnormal EMG on vastus

13   medialis and lateralis muscle.  The second page of Dr. Kim's report is obscured, but there was an

14   indication that her CPK was getting better.  AR 812.

15       Plaintiff was seen by Dr. Lee Reese for a muscle biopsy on November 20, 2015.  Plaintiff

16   stated that she had a sensation that the muscle in her right groin was giving out.  She was

17   frustrated because she had been told that the biopsy had a high possibility of being normal and

18   not explaining the problem.  Dr. Rees indicated that Plaintiff's musculoskeletal system was

19   positive for weakness, arthralgias, and joint pain.  There was no limb pain or swelling.  AR 813.

20   Plaintiff underwent the muscle biopsy on December 15, 2015.  AR 817-818.  According to a

21   MountainView Hospital record, Plaintiff's CK level was 501 on or about December 15, 2015.

22   AR 821.  The diagnosis of the biopsy sample on December 30, 2015 was "very mild type 2

23   myofiber atrophy and one necrotic myofiber without active inflammation."  AR 819.

24       Two state agency physicians, Rene Pena, M.D. and Charles K. Lee, M.D., evaluated

25   Plaintiff's claim on January 1, 2014 and April 24, 2014, respectively.  AR 98-103, 113-119.  Dr.

26   Pena found that Plaintiff had spine disorders, and Dr. Lee found that she had dysfunction of the

27   major joints and spine disorders.  Both doctors stated that Plaintiff's statements regarding the

28

1  severity of her symptoms were only partially credible because the medical records and consultive

2  examination findings did not support her claim of total disability.  AR 101, 115.  They opined

3  that Plaintiff had the physical residual functional capacity to occasionally lift 20 pounds,

4  frequently lift 10 pounds; to stand and/or walk, or sit, with normal breaks, for about six hours in

5  an eight-hour work day; unlimited ability to push or pull; the ability to frequently climb ramps or

6  stairs, and to occasionally climb ladders, ropes or scaffolds; unlimited ability to balance and

7  stoop; and occasional ability to kneel, crouch or crawl.  AR 102-103, 115-117.

8      **C. Administrative Law Judge's Decision**

9          The ALJ applied the five-step sequential evaluation process established by the Social

10  Security Administration, 20 CFR 416.920(a), in determining whether Plaintiff was disabled.  AR

11  52-53.[3]  The ALJ noted that Plaintiff met the insured status requirements of the Social Security

12  Act through December 31, 2017.  At step one, he found that Plaintiff had not engaged in

13  substantial gainful activity since April 28, 2012.  AR 53.

14          At step two, the ALJ found that Plaintiff had the following severe impairments:

15  osteoarthritis of the left knee, degenerative disc disease of left knee/meniscus tear, status post

16  arthroscopic [surgery] of the left knee, degenerative disc disease of the cervical spine, obesity,

17  and positive ANA/connective tissue disorder.  AR 53.  He found that Plaintiff's medically

18  determinable impairment of rhabdomyolosis did not cause more than a minimal limitation on her

19  ability to perform basic work activities and was therefore not a severe impairment.  The ALJ

20  stated:

21          The medical evidence of record reveals that the claimant received emergency
22          treatment in June of 2015 with admitting diagnosis of generalized pain,
            rhabdomyolosis, anxiety, state, arthropathy, and diabetes mellitus, not
23          uncontrolled.  The claimant was discharged in stable condition.  There is no
            objective medical evidence to support that this condition has lasted or can be
24          expected to last for a continuous period of 12 months or more.  Accordingly,
            the undersigned finds the claimant's medically determinable impairment of
25          rhabdomyolosis is non-severe.

26  ───────────────────

27  [3] The ALJ's decision appears twice in the administrative record. The Court bases its citations on pages 51-
    59 of the record.

28

14

AR 54.

The ALJ also stated that there was no diagnosis for the cause of Plaintiff's alleged hip pain, and that a medically determinable impairment cannot be established solely on the basis of symptoms.  He therefore found that Plaintiff's hip pain did not rise to the level of a medically determinable impairment. The ALJ also found that Plaintiff's elevated CPK and hypertension were not severe medical impairments.  AR 54.  As discussed hereafter, the elevated CPK is related to the diagnosis of rhabdomyolosis.  AR 54.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920, 416.925, 416.926).  AR 54-55.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except that she could frequently climb stairs or ramps; occasionally climb ladders; never climb ropes or scaffolds; occasionally kneel, crouch, and crawl; and occasionally be exposed to cold temperatures and hazards such as heights and dangerous moving machinery.  The ALJ stated that Plaintiff's medically determinable impairments could reasonably be expected to cause he alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.  AR 55.

The ALJ noted that "recent musculoskeletal and neurologic examination finds 5/5 strength in the upper and lower extremities, no tenderness on palpation of the back or neck, full range of motion in all joints but only mild tenderness on palpation of the left shoulder."  Plaintiff was able to move all extremities normally, and she experienced improvement from physical therapy in 2013 and 2014.  The ALJ also summarized the physical examination findings made by Dr. Sherman in January 2014.  AR 56-57.

1    The ALJ found Plaintiff's allegations regarding pain and physical limitations less than

2    fully credible due, in part, to her ability to engage "in a somewhat normal level of daily activity

3    and interaction."  Plaintiff was able to care for her hair, feed herself, and use the toilet by herself.

4    She could prepare her own meals, perform household chores such as dusting, vacuuming, and

5    laundry, drive an automobile, shop in stores for food and household cleaning products, manage

6    money, pay bills, read, watch television, do crossword puzzles, and spend time with others on a

7    daily basis.  The ALJ also noted the report that Plaintiff had been "working out."  He stated that

8    some of the physical and mental activities and interactions that Plaintiff engaged in were the

9    same as those required for obtaining and maintaining employment.  AR 57.

10    The ALJ stated that Plaintiff had not received the type of medical treatment one would

11    expect from a totally disabled individual.  He also noted that she stopped working in early 2012

12    because her temporary job assignment was completed.  Although Plaintiff "stopped working for

13    meritorious reasons, those reasons are unrelated to her medical conditions and suggest that she

14    would still be working had the assignment not been completed."  AR 58.

15    The ALJ gave great weight to the opinions of the State agency medical consultants, Dr.

16    Pena and Dr. Lee, who found that Plaintiff had the physical residual capacity to perform work at

17    the light level.  Nothing in the record contradicted their opinions that Plaintiff did not meet or

18    equal a medical listing, and he found that their opinions were reasonable and consistent with the

19    objective medical evidence.  AR 58.  The ALJ gave significant weight to the opinions of Dr.

20    Sherman.  However, due to some new evidence received after Dr. Sherman rendered his opinion,

21    the ALJ found that Plaintiff was limited to occasionally lifting 20 pounds and frequently lifting

22    10 pounds, as opposed to the greater weights opined by Dr. Sherman.  AR 58.

23    Based on his determination of Plaintiff's residual functional capacity to perform light

24    work, the ALJ found at step four that she was capable of performing her previous work as a

25    payroll manager and payroll clerk.  AR 59.  He therefore concluded that Plaintiff was not

26    disabled from January 1, 2014 to November 17, 2015.

27    . . .

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DISCUSSION

### I.   Standard of Review

A federal court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Lewis v. Apfel*, 236 F.3d 503, 509 (9th Cir. 2001) (citing *Morgan v. Commissioner of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).  The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (quoting *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)).  In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

1      In reviewing the administrative decision, the District Court has the power to enter "a

2  judgment affirming, modifying, or reversing the decision of the Commissioner of Social

3  Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In the

4  alternative, the District Court "may at any time order additional evidence to be taken before the

5  Commissioner of Social Security, but only upon a showing that there is new evidence which is

6  material and that there is good cause for the failure to incorporate such evidence into the record

7  in a prior proceeding."  *Id.*

8      **II.    Disability Evaluation Process**

9      To qualify for disability benefits under the Social Security Act, a claimant must show (a)

10  that she suffers from a medically determinable physical or mental impairment that can be

11  expected to result in death or that has lasted or can be expected to last for a continuous period of

12  not less that twelve months; and (b) that the impairment renders her incapable of performing the

13  work that she previously performed and incapable of performing any other substantial gainful

14  employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.

15  1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving

16  disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122

17  (1996).  If the claimant establishes an inability to perform her prior work, the burden shifts to the

18  Commissioner to show that the claimant can perform a significant number of other jobs that exist

19  in the national economy.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).  Social

20  Security disability claims are evaluated under a five-step sequential evaluation procedure.  *See*

21  20 C.F.R. § 404.1520(a)-(f).  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The

22  claimant carries the burden with respect to steps one through four.  *Tackett v. Apfel*, 180 F.3d

23  1094, 1098 (9th Cir. 1999).  The sequential evaluation process is accurately set forth in the

24  ALJ's decision, AR 52-53, and will not be repeated here.

25  . . .

26  . . .

27  . . .

28

1
2
3

### III.    Analysis and Findings

#### A.  Whether the ALJ Erred in Finding that Plaintiff's Rhabdomyolysis was a Non-Severe Medical Impairment.

Plaintiff argues that the ALJ erred in finding that her rhabdomyolysis was a non-severe medical impairment.  She argues that there was sufficient objective medical evidence to support a finding that this impairment significantly limited her physical ability to do basic work activities, and that it could be expected to last for a continuous period of 12 months or more. *Plaintiff's Motion for Reversal* (ECF No. 14), 7-8.  Defendant argues, however, that Plaintiff failed to meet her burden to prove that rhabdomyolysis significantly limited her ability to do basic work activities or that this impairment could be expected to last 12 months or more. *Defendant's Cross-Motion* (ECF No. 27), 5-6.

Plaintiff carries the initial burden of establishing that she has a medically severe impairment or combination of impairments.  The mere existence of an impairment, or even multiple impairments, does not establish severity.  *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2293-94 (1987).  The step-two inquiry, however, "is a de minimus screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen*, 482 U.S. at 153-154, 107 S.Ct. at 2297-98).  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individuals [sic] ability to work.'"  *Id.*  "'[I]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step.'"  *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (quoting S.S.R. No. 85-28).  "A medical impairment may only be found non-severe when that conclusion is 'clearly established by medical evidence.'"  *Id.*

1    Rhabdomyolysis is the breakdown of muscle tissue that leads to the release of muscle

2   fiber contents into the blood.  These substances are harmful to the kidneys and can cause kidney

3   damage.  Rhabdomyolysis can be caused by trauma, use of drugs including statins, and severe

4   exertion.  Symptoms may include dark, red, or cola-colored urine, decreased urine output,

5   general weakness, muscle stiffness and aching (myalgia), muscle tenderness, and weakness of

6   the affected muscles.  Other symptoms can include fatigue, joint pain, seizures and unintended

7   weight gain.  The condition can be treated by hydration, including intraveinously.  The outcome

8   of the condition depends on the amount of kidney damage.  People with milder cases may return

9   to their normal activities within a few weeks to a month.  However, some people continue to

10  have problems with fatigue and muscle pain.  *See* MedlinePlus,

11

12  https://medlineplus.gov/agency/article/000473.htm (accessed on August 17, 2018).

13    The medical records indicate that Plaintiff began to complain of increased pain symptoms

14  in February 2015.  On February 9th, she complained of left shoulder pain which she rated as a 7.

15  On March 6th, she complained of body pain all over.  The doctor's diagnosis on that date

16  included back pain, wandering joint pain and elevated liver enzyme.  AR 573, 570.  On May 1st,

17  she complained to Dr. Kim of migrating joint pain, including the knees, ankle and neck, left

18  shoulder pain, stiff hands, and swollen feet.  AR 579.  At the time of her hospital admission on

19  June 13th, Plaintiff reported that she began to have "total body aching more than 3 months ago.

20  For that reason, her physicians had taken her off atorvastatin and metformin."  Plaintiff indicated

21  that her pain had not improved, but was even worse.  She also complained of right hip pain,

22  which she had also reported to Dr. Kim on June 4, 2015.  AR 599, 807.  Due to her elevated

23  CPK, in excess of 1600, Plaintiff was diagnosed with rhabdomyolysis.  AR 584.

24

25

26

27

28

The symptoms that Plaintiff complained of between February and June 2015 were consistent with those caused by rhabdomyolysis. Plaintiff's complaints of right hip pain which arose during this period could also reasonably be a symptom of rhabdomyolysis. To the extent that the ALJ found that Plaintiff's symptoms of pain and weakness between February and July 2015 had no more than a minimal effect on her ability to work, that finding was not clearly established by the medical evidence. To the contrary, Plaintiff's reports of significant pain "all over," and pain and weakness throughout her joints supports the contrary finding.

The ALJ also found, however, that there was no objective medical evidence that the symptoms caused by rhabdomyolysis had lasted or could be expected to last for a continuous period of 12 months or more. AR 54. According to the June 16, 2015 hospital discharge summary, Plaintiff's CK level went down significantly prior to discharge and she reported feeling better. AR 584. On September 3, 2015, Plaintiff's CPK level was down to 356. AR 811. Although it apparently rose to 501 on December 15, 2015, there is no indication that the increase in the CK level was accompanied by continued or increased pain or weakness. The medical records following Plaintiff's hospital discharge, including Dr. Kim's and Dr. Reese's reports, are silent as to whether she was continuing to experience significant pain or weakness. Although Plaintiffs' burden of proof at step two of the sequential process is very low, the Court cannot conclude that the ALJ erred in finding that Plaintiff's rhabdomyolysis was not a severe impairment based on the 12-month durational requirement.

**B. Whether the ALJ Properly Considered Plaintiff's Pain and Symptom Testimony**

The ALJ found that Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, but found that her statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible. AR 55. Plaintiff argues that the ALJ's decision should be reversed because he failed to articulate legally sufficient reasons for rejecting

1  Plaintiff's hearing testimony regarding the severity of her symptoms of pain and physical

2  weakness.

3        If the claimant has presented sufficient evidence of an underlying physical or mental

4  impairment that could reasonably cause her symptoms, then, in the absence of evidence of

5  malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the

6  credibility of the claimant's testimony regarding the severity of her pain or other symptoms.

7  *Burrell v. Colvin*, 775 F. 3d 1133, 1136-37 (9th Cir. 2014) (citing *Molinay v. Astrue*, 674 F. 3d

8  1104,1112 (9th Cir. 1991) (en banc); *Swenson v. Sullivan*, 876 F. 2d 683, 687 (9th Cir. 1989);

9  *Gallant v. Heckler*, 753 F. 2d 1450, 455 (9th Cir. 1984)).  The ALJ must state the reasons why

10  the testimony is unpersuasive, and must specifically identify what testimony is credible and what

11  testimony undermines the claimant's complaints.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574

12  F. 3d 685, 693 (2009) (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F. 3d 595, 599(9th

13  Cir. 1999)).

14        The ALJ may not reject a claimant's subjective complaints based solely on a lack of

15  medical evidence to fully corroborate the alleged severity of pain.  The rationale for this

16  restriction is that pain testimony may establish greater limitations than can medical evidence

17  alone.  *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (citing SSR 96–7p (1996)).  In

18  determining credibility, the ALJ may engage in ordinary techniques of credibility evaluation,

19  such as considering claimant's reputation for truthfulness and inconsistencies in claimant's

20  testimony.  *Id.* (citing *Tonapetyan v. Halter,* 242 F.3d 1144, 1148 (9th Cir. 2001)).  The ALJ

21  may also consider factors such as (1) the nature, location, onset, duration, frequency, radiation,

22  and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity,

23  environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain

24  medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions;

25  and (6) the claimant's daily activities.  *Id.* (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th

26  Cir. 1991)).  As these factors indicate, medical records can provide relevant information that

27  impeaches the credibility of Plaintiff's testimony.  For example, medical records indicating that a

28

1   claimant denied pain or reported only mild pain in a particular body part, may properly be used

2   to discount her later claims of severe pain in that body part.

3        In evaluating the medical evidence, the ALJ noted that following her left knee surgery in

4   September 2013, Plaintiff underwent physical therapy in 2014 for abnormal gait due to her knee

5   condition and was discharged with documented improvement in range of motion and lower

6   extremity strength.  He also noted that although Plaintiff had degenerative conditions of the

7   cervical and lumbar spines, she experienced improvement in her range of motion as a result of

8   physical therapy in 2013 and 2014.  Plaintiff was not referred to a surgeon, but was instead

9   recommended diet and exercise.  AR 56.  The ALJ stated that Plaintiff did not generally receive

10  the type of medical treatment that one would expect for a totally disabled person.  Her medical

11  treatment was essentially routine and conservative in nature.  AR 58.

12       The ALJ gave significant weight to the opinions of Dr. Sherman who examined Plaintiff

13  in January 2014 and found her to have normal ranges of motion and muscle strength on physical

14  examination and the ability to ambulate, sit down and up in a normal manner.  Dr. Sherman

15  stated that Plaintiff did not need a cane for ambulation.  He provided an assessment of Plaintiff's

16  residual functional assessment that was greater than what the ALJ ultimately adopted.  AR 57-

17  58.  The ALJ also noted that Plaintiff stopped working in 2012 because her assignment was

18  complete which suggested that she would still be working if her job had not ended.  Plaintiff

19  subsequently amended her alleged onset of disability to January 1, 2014 which was nearly two

20  years after she stopped working.  Plaintiff, thus, appeared to concede that she was not disabled

21  for a significant period after she stopped working.

22       The ALJ also cited Plaintiff's ability to engage in physical and mental activities of daily

23  living as indicative of her ability to obtain and maintain employment.  AR 57.  This is the least

24  persuasive of the ALJ's reasons for discounting Plaintiff's testimony about the severity of her

25  impairments.  The Court is required to carefully scrutinize credibility findings based on alleged

26  inconsistencies between a claimant's ability to perform activities of daily living and her

27  complaints of severe pain or other disabling limitations.  "The Social Security Act does not

28

1    require that claimants be utterly incapacitated to be eligible for benefits, and many home

2    activities may not be easily transferable to a work environment where it might be impossible to

3    rest periodically or take medication." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014)

4    (quoting *Smolen*, 80 F.3d at 1287 n.7).  Only if a claimant's level of activity is inconsistent with

5    her claimed limitations would these activities have any bearing on her credibility.  *Id.* (citing

6    *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)).

7          Plaintiff's descriptions of her daily activities in her 2014 disability reports and her August

8    2015 hearing testimony indicates that she became increasingly affected by pain and weakness

9    such that her ability to engage in activities such as cooking, housecleaning, driving and shopping

10   became more limited over time.  Her testimony regarding her impairments and limitations in

11   August 2015 could support a finding of disability.  It appears, however, that Plaintiff was

12   suffering from the effects of rhabdomyolysis at the time of the hearing.  As discussed above, she

13   has not shown that this was more than a temporary condition.  It was therefore reasonable for the

14   ALJ to conclude that Plaintiff had a greater functional capacity than her hearing testimony or

15   previous disability reports indicated.

16         The ALJ placed great weight on the opinions of the state agency physicians whose

17   assessments of Plaintiff's residual functional capacity were consistent with that determined by

18   the ALJ in his decision.  The Court notes that Plaintiff's treating physicians did not provide any

19   . . .

20   . . .

21   . . .

22   . . .

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28

opinions on disability or her residual functional capacity.  The Court therefore concludes that the ALJ's determination of Plaintiff's residual functional capacity and ability perform her past work was supported by substantial evidence in the record.  Accordingly,

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal and/or Remand to the Social Security Administration (ECF No. 14) be **denied** and that the Commissioner's Cross Motion to Affirm and Opposition to Plaintiff's Motion for Remand (ECF No. 17) be **granted**.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn,* 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

Dated this 27th day of August, 2018.

*George Foley Jr.*

_____
GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE